UNITED STATES of America, Plaintiff,

v.

Maurice M. TAYLOR, Sr.; Madeline R. Taylor; Maurice M. Taylor, Jr.; Brent L. Taylor; Frederick B. Taylor; Arthur R. Reibel; 418922 Ontario Limited; Ellsworth TDS, Incorporated, Defendants.

Maurice M. TAYLOR, Sr.; Madeline R. Taylor; Maurice M. Taylor, Jr.; Brent L. Taylor; Frederick B. Taylor; 418922 Ontario Limited, Counter-claimants,

v.

UNITED STATES of America, Counter-defendant.

Maurice M. TAYLOR, Sr.; Madeline R. Taylor; Maurice M. Taylor, Jr.; Brent L. Taylor; Frederick B. Taylor; 418922 Ontario Limited, Third–Party Plaintiffs,

v.

STATE OF MICHIGAN; Michigan Department of Natural Resources; Disco Manufacturing, Inc.; Michigan Fruit Canners, Inc.; CSX Transportation; Elmer F. Crain; Clara M. Crain, Third–Party Defendants.

STATE OF MICHIGAN, Counter-claimant,

v.

Maurice M. TAYLOR, Sr.; Madeline R. Taylor; Maurice M. Taylor, Jr.; Brent L. Taylor; Frederick B. Taylor; 418922 Ontario Limited; Counter-defendants.

Elmer F. CRAIN and Clara M. Crain, Third–Party Plaintiffs,

v.

THE VILLAGE OF ELLSWORTH, Third–Party Defendant.

MICHIGAN DEPARTMENT OF NATURAL RESOURCES, Cross–Claimant,

v.

Arthur R. REIBEL and Ellsworth TDS, Incorporated, Cross-defendants.

No. 1:90:CV:851.

United States District Court, W.D. Michigan.

July 24, 1992.

Thomas J. Gezon, Richard S. Murray, Asst. U.S. Attys., John A. Smietanka, U.S. Atty., Grand Rapids, Mich., Richard B. Stewart, U.S. Dept. of Justice, Environment & Natural Resources Div., Environmental Enforcement Section, Washington, D.C., Terence Branigan, U.S. E.P.A., Region V, Chicago, Ill., David L. Dain, U.S. Dept. of Justice, Environmental Defense Section, Land & Natural Resources Div., Douglas Dixon, U.S. E.P.A., Gregory L. Sukys, U.S. Dept. of Justice, Environmental Enforcement Section, Environment and Natural Resources Div., Washington, D.C., for U.S.

David Murphy, Elaine E. Black, Brian L. Morrow, Pepper, Hamilton & Scheetz, Detroit, Mich., Cheri Taylor Holley, Cheri T.

Holley, Grosse Pointe Park, Mich., for Maurice M. Taylor, Sr., Madeline R. Taylor, Maurice M. Taylor, Jr., Brent L. Taylor, Frederick B. Taylor, 418922 Ontario Ltd.

Arthur C. Reibel, pro se.

Ellsworth TDS, Inc., pro se.

A. Michael Leffler, Jeremy M. Firestone, Frank J. Kelly, Atty. Gen., Appellate Div., Kathleen L. Cavanaugh, Asst. Atty. Gen., Frank J. Kelley, Atty. Gen., Environmental Protection Division, Lansing, Mich., for State of Mich., Michigan Dept. of Natural Resources.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., for Michigan Fruit Canners, Inc.

Alan C. Bennett, Law, Weathers & Richardson, Grand Rapids, Mich., for CSX Transp.

Richard E. Joseph, Pointner, Golski & Joseph, PC, Charlevoix, Mich., for Elmer F. Crain and Clara M. Crain.

James G. Young, Bellaire, Mich., for The Village of Ellsworth.

## OPINION

ENSLEN, District Judge.

This case is before the Court on the Michigan Department of Natural Resources' (MDNR) motion for an immediate order in aid of access to certain property in order to complete a remedial investigation. The underlying complaint is an action brought by the United States Environmental Protection Agency (USEPA) to recover the response costs incurred in responding to the release or threatened release of hazardous substances on property, the International Disc Site (Site or IDC), located in the Village of Ellsworth, Antrim County, Michigan. Some of the defendants filed a third party complaint against the MDNR, as well as other alleged past or present owners/operators of the Site, seeking reimbursement and contribution. In response, the MDNR filed a counter-claim to recover response costs and damages.

In the motion now before the Court, the MDNR seeks injunctive relief ordering certain defendants to allow it access to a part of the Site to which it has no free access in order to undertake a remedial examination of the Site. Defendants, Arthur R. Reibel and Ellsworth TDS, Inc., object to allowing access on the grounds that "there is no reasonable basis to believe there are any hazardous substances or pollutants or contaminants from which a release could be generated under the requirements of CERCLA or MERA." Brief in Objection at 20. The parties have filed numerous exhibits and affidavits in support of their arguments. Given that MDNR has a right of access if there is a reasonable basis to believe there is even a threat of contamination, I find no genuine issue of fact and conclude a hearing is unnecessary.

### Facts

Defendants do not challenge MDNR's asserted legal right to inspect the property if there is a reasonable basis to believe that there has been or could be a release of any hazardous substances at the site. Defendants argue, however, that there is insufficient factual support to find a reasonable basis.

In response to a citizen's complaint reported in 1985, the MDNR sought permission to search and to take samples from the Site because the complainant was concerned about chemical contamination of Lake Ellsworth from the manufacturing facility on the Site. Defendant Brent Taylor refused the MDNR agent general access, but allowed samples to be taken from the shoreline of Lake Ellsworth and the surrounding groundwater. Due to a mixup of samples at the laboratory, the MDNR incorrectly reported that preliminary tests showed toxic levels of arsenic contamination in Lake Ellsworth, as well as high concentrations of copper and chromium. The Chief of the Environmental Services Division indicated that it was the first error of that kind to occur in the three years since he had been associated with the Division, even though the laboratory handled over 200,000 analyses annually. Defendants' Brief in Objection, Ex. 2.

Prior to learning of the error, the MDNR sought a search warrant to gain access to

the Site, conduct a search of the property, and take samples of waste chemicals, soils, and drums on the property, as well as of groundwater and the sediment of Lake Ellsworth to determine whether the property was contaminated with or threatened by contamination with toxic waste. In the supporting affidavit, the MDNR submitted the erroneous lab reports, along with other substantial evidence of actual or threatened contamination. The affiant also cited many independent sources of contamination from the Site. Defendants' Brief in Objection, Ex. 6. The affiant noted that various discharges had been observed from the facility on the site and that the facility had installed a heat treating line that utilized cyanide salts and a cadmium plating line. *Id.* Moreover, the affiant reported that MDNR personnel had observed numerous chemical storage drums on the premises.

Defendants argue that after obtaining notice of the error, but prior to public disclosure, the MDNR used the affidavit containing the false reports to institute actions taken by the Michigan Department of Public Health (MDPH), such as erecting a fence around the property, in order to reinforce the image that the property presented a public hazard and to diminish the impact of its erroneous reporting. According to defendants, the MDNR "had convinced the media, the public and the MDPH that IDC had polluted the entire lake, all soil and the air, when they knew none of it was true." *Id.* at 4.

Defendants maintain that because of the two false results contained in the affidavit supporting the search warrant, the subsequent actions taken by the MDPH, the USEPA and the MDNR were without adequate basis insofar as the grounds for their actions were the erroneous test results contained in the affidavit. The defendants' own exhibits indicate, however, that the MDNR produced substantial other evidence of environmental hazards in or on the property and that the other agencies relied on additional information from other agents. *Id.* Ex. 7.

Pursuant to the MDNR's investigation in November 1985, the USEPA became involved. According to the USEPA's report, the MDNR's collected samples had indicated that the waste stored on the premises included cyanides and strong acids. Additionally, its environmental samples showed elevated metal concentrations in the soils and sediments. Defendants maintain that the USEPA's subsequent investigation revealed no conclusory evidence of hazardous waste in or on the property. "It turns out the EPA did not find any toxic or hazardous chemicals as falsely claimed in the search warrant in July 1987." *Id.* at 10.

*Law*

MDNR seeks access to the site pursuant to the Michigan Environmental Response Act (MERA), Mich.Comp.Laws Ann. § 299.-601, *et seq.* and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601, *et seq.* The statutory language of MERA was modelled after CERCLA and provides:

(3) If there is a reasonable basis to believe that there may be a release or threat of release, the directors or their authorized representatives shall have the right to enter at all reasonable times any public or private property for any of the following purposes;

(a) Identifying a facility.

(b) Investigating the existence, origin, nature, or extent of a release or threatened release.

(c) Inspecting, testing, taking photographs or videotapes, or sampling of any of the following: soils, air, surface water, groundwater, suspected hazardous substances, or any containers or labels of suspected hazardous substances.

(d) Determining the need for or selecting any response activity.

(e) Taking or monitoring implementation of any response activity.

Mich.Comp.Laws Ann. § 299.610d(3). Furthermore, the Act specifically provides that if access is denied, the attorney general may institute a civil action to force compliance. *Id.* § 299.610d(7). The Court must

enjoin interference with requests for entry and inspection where "there is a reasonable basis to believe there may be a release or a threatened release" unless "defendant establishes that, under the circumstances of the case, the request is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 299.-610d(8).

### Discussion

I find that defendants have not demonstrated that the MDNR's request is arbitrary and capricious or an abuse of discretion. In summarizing its response action in 1987, the USEPA stated that its action was instituted to "mitigate the threats to public health posed by the presence of open vats containing large quantities of strong acids, bases, flammable, and cyanide-bearing materials." Defendants' Brief in Objection, Ex. 11. After stabilizing the site, the USEPA states that it removed approximately 3,900 gallons of liquids—which it characterized as acids, bases, flammable, or cyanide-bearing—and about 130 cubic yards of "hazardous waste solids." *Id.* Defendants have presented the affidavit of an expert who states that the EPA's test results showing contamination were not reliable for several reasons. For example, the expert testifies that the EPA's standardized tests for spent oxidizer solids resulted in conflicting results by two different laboratories—an outcome which he acknowledges was not unusual. Because of the conflicting results of the standardized tests, the USEPA conducted a different type of test, which is not an approved test under the EPA. That test, the DOT test, had positive results. Although these conflicting results may not be conclusive evidence of contamination, the expert does not propose a conclusive method of testing for oxidizer solids and I cannot say that the government does not have a reasonable basis for believing there is, at least, the threat of contamination. The expert also questions the validity of the conflicting results from two different labs that tested for the presence of PCB's. One of the labs had negative results and the other indicated concentrations at possibly dangerous levels. The expert questions the results because "false positives are probable and common without proper methodology and quality control." *Id.* Ex. 14. The results, however, are sufficient to establish a reasonable basis for believing there is at least the threat of a release of hazardous substances. Finally, the expert notes discrepancies between the test results and the waste manifests, causing doubt about the classification of the waste. However, doubt regarding the presence of hazardous solid wastes does not establish that there is no reasonable basis for believing that a threat exists.

In April 1991, the MDNR conducted further studies. Defendants claim that "[a]ny reasonable person reading this report and checking the data qualifiers certainly knows that the results were negative regarding any hazardous substances." Defendants have submitted no expert analysis of the results obtained from the samples collected in April 1991. The analytical results reported by the MDNR indicate the presence of volatile organic compounds, a PCB, heavy metals, phthalates, and other substances. The Court is unable to analyze the importance of these findings, and must defer to the MDNR's scientist's conclusion that they show "soil, groundwater, and sediment contamination." Brief in Support at 7; Affidavit of Robert Wagner Ex. 1; Screening Site Inspection Report Ex. B at 4–1 & –2.

Given the evidence produced by the MDNR, I am unable to find that there is no reasonable basis for it to believe that at least the threat of toxic waste contamination exists at the Site. Accordingly, it is my decision to grant MDNR's motion for immediate order in aid of access.

Section 299.610d(10) of Michigan Compiled Laws Annotated authorizes the court to impose a penalty of up to $25,000 for each day of noncompliance against anyone who unreasonably denies access pursuant to the Act. Alleging, without dispute, that this is at least the third time that defendants have denied access, the MDNR seeks imposition of a penalty of $25,000 per day.

I find that defendants have demonstrated no reasonable grounds for denying access to the MDNR to conduct further environmental studies of the property. Many of the April 1991 sample test results are qualified, but according to MDNR's evidence there were many contaminants detected at the site without qualification. Accordingly, I impose a penalty of $500.00 per day for every day that defendants have denied access to the MDNR.